UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                     :
VALERIE EVANS,                                       :
                                                     :
                    Plaintiff,                       :        OPINION AND ORDER
                                                     :
              -against-                              :
                                                     :        14 Civ. 4093 (GWG)
COMMISSIONER OF SOCIAL SECURITY,                     :
                                                     :
                    Defendant.                       :
                                                     :
------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

        Plaintiff Valerie Evans brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial

review of the final decision of the Commissioner of Social Security ("Commissioner") denying

her claim for disability benefits under the Social Security Act.  Evans has moved for judgment

on the pleadings pursuant to Fed. R. Civ. P. 12(c), and the Commissioner has cross-moved for

judgment on the pleadings.[1]  The parties consented to having this matter decided by a United

States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, the

Commissioner's motion is granted, and Evans's motion is denied.

---

        [1]  See Memorandum in Support of Motion, filed Sept. 15, 2014 (annexed as Attach. 2 to
Docket # 8) ("Pl. Mem."); Notice of Motion, filed Sept. 26, 2014 (Docket # 9); Notice of
Motion, filed Oct. 6, 2014 (Docket # 12); Memorandum of Law in Opposition to Plaintiff's
Motion for Judgment on the Pleadings and in Support of the Commissioner's Motion for
Judgment on the Pleadings, filed Oct. 6, 2014 (Docket # 13) ("Def. Mem."); Memorandum of
Law in Reply to Defendant's Cross-Motion for Judgment on the Pleadings, and in Further
Support of Plaintiff's Motion for Judgment on the Pleadings, filed Nov. 22, 2014 (Docket # 18)
("Pl. Reply"); Reply Memorandum of Law in Further Support of the Commissioner's Motion for
Judgment on the Pleadings, filed Dec. 8, 2014 (Docket # 19).

1

I.      BACKGROUND

      A.      Evans's Claims for Benefits and Procedural History

Evans filed applications for Social Security Disability benefits and for Supplemental

Security Income payments.  See Administrative Record, filed Aug. 14, 2014 (Docket # 6) ("R."),

at R. 113, 213-25.  In the applications, Evans alleged disability as of October 1, 2010.  R. 213,

218, 220.  Evans was previously employed as a contract negotiator, executive assistant, facilities

assistant, and legal assistant.  R. 267.  Evans stopped working on June 7, 2010, because her

employer "went out of business."  R. 278.

      Evans's applications were denied.  R. 120-27, 138-43.  Evans then requested a hearing

before an Administrative Law Judge ("ALJ"), R. 149-50, which was held on July 11, 2013.

R. 66-73.  At the July 11 hearing, the ALJ concluded that the record was incomplete.  See R. 68-

72.  Another hearing before the ALJ was held on August 23, 2013, R. 74-112, after the

submission of additional evidence, R. 77.  At the August 23 hearing, Evans, through counsel,

amended the alleged onset date to September 30, 2011.  R. 78-79.  On September 27, 2013, the

ALJ issued a decision finding that Evans was not disabled.  R. 14-26.  The Appeals Council

denied Evans's request for review on April 17, 2014, making the ALJ's determination the

Commissioner's final decision.  R. 1-6.

      B.      The Administrative Record

Evans and the Commissioner have each provided a summary of the medical evidence

contained in the administrative record.  See Pl. Mem. at 2; Def. Mem. at 2-13.[2]  The Court

---

      [2]  The Court notes that Evans's submission failed to comply with the Court's requirement
that "[e]ach statement in a party's summary of the record shall be followed by a citation to the
appropriate page of the record."  Scheduling Order, filed Aug. 15, 2014 (Docket # 7), ¶ 5.

adopts the parties' summaries, which do not conflict in any material way, as accurate and complete for purposes of the issues raised in this suit.  We discuss the portions of the medical record pertinent to the adjudication of this case in section III below.

       C.      <u>The Hearings Before the ALJ</u>

A hearing before ALJ Michael J. Stacchini was held on July 11, 2013.  R. 66-73.  Evans was represented at the hearing by attorney Robin Duncan.  R. 66.  Before going on the record, the ALJ had a brief conversation with counsel to discuss a "new treating source" whose records were missing.  <u>See</u> R. 68-72.  The ALJ stated that he felt he needed the records in order to conduct a fair hearing.  R. 69.

A second hearing before ALJ Stacchini was held on August 23, 2013.  R. 74-112.  Evans was again represented by Duncan.  R. 74.  New evidence had been submitted since the initial hearing.  R. 77.  Duncan believed the record before the ALJ was complete with respect to Evans's alleged disability.  <u>Id.</u>  The ALJ heard testimony from Evans as well as Esperanza DiStefano, a vocational expert.  R. 75.

Evans amended her disability onset date to September 30, 2011.  R. 78-79.  Evans testified that she lives in a house with a roommate and a dog, R. 80, and that she had no problems living with the roommate, R. 106.  She does not walk the dog but she lets him out in the yard and feeds him.  R. 82-83.  She has not done any of the cleaning around the house since the alleged onset date.  R. 80-81.  Evans goes food shopping once every week or two and cooks using the microwave.  R. 81.  Her only hobby since the alleged onset date has been watching movies.  <u>Id.</u>  She has been to museums approximately three times since the alleged onset date, and she has been able to go to the movies and the beach with friends.  R. 81.  They also go over to her house.  R. 82.  Evans does not use public transportation but she sometimes drives.  R. 87-

3

88.

Evans testified that she began taking classes part-time online in 2009, while she was still working. R. 82. When she lost her job, she started taking classes full-time. Id. Prior to having surgery, Evans attended one class that required her to go to museums. R. 90. At the time, Evans was receiving spinal shots and had to miss some of the classes and make them up later. Id. After her surgery, Evans took all of her classes online at home. Id. Evans graduated cum laude in May 2013, with a degree in fashion merchandising. R. 82.

According to her attorney, Evans was assaulted on September 30, 2011. R. 78-79. The record indicates that this was the result of a "road rage" incident where a man got out of his car and "struck [Evans] in the face." R. 374, 379. Evans suffered a "combination of severe neck and back pain with radiculopathy status post cervical intervention as well as panic and anxiety disorder." R. 79. Evans testified that she had cervical spine surgery on August 14, 2012, but reported that she felt worse afterwards. R. 85-86, 103. While the surgery "took away the tingling in [her] arms and [her] left leg," she developed "new tingling at the bottom of [her] feet" and the pain in her neck was worse than before the surgery. R. 86. She also has less range of motion when rotating her head. Id. The pain does not go down her arms. R. 91. Her lumbar pain has largely resolved, and although she gets "a little bit" once in a while, "it's never been a problem." Id. However, her neck bothers her unless she is lying down. R. 92.

At the time of the hearing, Evans was receiving "pain management" treatment. R. 87. She stated the pain medication only helps for a couple of hours after she takes it. Id. The medication also makes Evans tired and she sometimes gets headaches from it. Id. The only comfortable position where she is not in any pain is when she is lying down. R. 97. Evans stated at the hearing that she was "dying right now with muscle spasms" and that the medication

4

she took for them does "nothing."  Id.  When it gets to "a certain point in the day," Evans

testified that she is "kind of done for the day."  Id.  Evans reported that she cannot predict when

she will get up in the morning or what she is going to feel like for the day.  Id.  She stated that

she "basically . . . ha[s] no life."  Id.

The ALJ asked about Evans about her mental impairments — referring to Evans's

diagnosed ADHD, anxiety, and panic, as well as references in the record to her depressed

moods.  R. 92.  Evans's anxiety and panic got worse when she began to "have trouble walking"

in May 2012.  Id.  Evans was afraid to go out because she feared she could fall and would not be

able to get up or no one would be around to help her and her cell phone would die.  Id.  She also

gets irritated and edgy because of the constant pain she has been in for two years, and she is

more indecisive than she was before.  R. 92-93.  However, minor changes in her routine do not

affect her anxiety in any significant way.  R. 93-94.

The ALJ asked whether Evans's hypertension was under control.  R. 94.  Evans replied

that "[i]t goes up and down."  Id.  She takes medicine for it but she sometimes gets dizzy, though

she does not know if that is attributable to the hypertension or something else, such as her neck

problems.  R. 94-95.

Evans testified that she has tried to exercise since her motor vehicle incident in

September 2011.  R. 90, 358.  She tried a "Fitness Boot Camp," and she does yoga and uses the

elliptical machine "a couple times a week" each.  R. 90-91.

Evans has not applied for a job since September 2011.  R. 88.  At the time of the hearing,

Evans was not looking for work, but she was looking to continue with school for her bachelor's

degree in fashion merchandising.  R. 95-96.  At the time, she was registered for three classes

scheduled to begin on August 26, 2013.  R. 96.  Evans had not tried to get an internship because

she could not promise that she would be at the job at 9:00 a.m.  Id.

Evans's attorney also questioned her.  See R. 97-103.  First, he asked her about her online classes.  R. 97-98.  Evans spent about two hours a day at home studying while she was taking classes.  Id.  She took the classes on her laptop, which she props up on her knee while she is lying down in bed.  R. 98.  She has to take breaks during the course of her studying because her mind gets foggy, she gets frustrated, and she has difficulty concentrating.  Id.  She did not physically go to her professors for extra help, even though they were available to meet.  R. 105-06.

While she was testifying, the ALJ noticed Evans was "cupping" her neck.  R. 98.  When asked about it by her attorney, she stated that it makes it hurt less.  R. 98-99.  Even though she had taken two Dilaudid, a medication prescribed to her for her pain, Evans rated her pain at the hearing as a six on a 10-point scale.  R. 99.  She testified that she experiences the neck pain every day and that she has had one day since her surgery where she did not experience pain without taking a painkiller.  Id.  Some days are worse than others.  Id.  On bad days, which she estimates occur two to three times per week, she cannot leave her house.  R. 100.  On the remaining days of the week, Evans typically spends the day watching TV.  Id.

Evans's attorney asked about the numbness and tingling in her feet.  Id.  Evans reported that she started getting numbness and tingling in the bottoms of her feet after her surgery.  Id.  While the surgery corrected some of her prior numbness, it did not correct the numbness in her feet.  R. 100-01.  She stated that it feels like "pins and needles, like if your foot fell asleep" when she walks.  R. 101.  Her neck pain also affects her ability to walk.  Id.  She will feel good for a couple of hours after she takes Dilaudid in the morning, but after that she will experience pain no matter what she does, and lying down is the only way to relieve the pain.  Id.  Evans estimated

6

that she could walk a couple of blocks with the pain before she had to rest for an hour.  R. 101-02.

Evans testified she that spends most of the day — around 80 percent of it — watching TV while lying down on her side.  R. 102.  She stated that the reason why she cannot get an internship, travel to work, or work full-time was because of the pain.  Id.  The ALJ asked Evans whether she had any problems moving her head up and down or side to side.  Id.  Evans replied that she can do it, but some days were better than others and it is easier to do when she is standing because sitting puts pressure on her spine.  R. 102-03.  The ALJ noted that Evans had been turning her head to look at her attorney during the hearing.  R. 103.

Evans's attorney asked about her pain management treatment.  Id.  Evans testified she was receiving pain management treatment at Mount Kisco.  Id.  Evans had been prescribed Dilaudid and, following the hearing, Evans was going to receive "facet injections."  Id.  Evans had previously tried physical therapy but it made the pain worse.  Id.

The ALJ asked Evans about her prior work history.  R. 104.  Evans was a contract negotiator from August 2001 until her employer went out of business in June 2010.  Id.  Evans's responsibilities included finding garbage haulers to "service" locations for different customers of her employer.  Id.  From June 2001 to April 2001, Evans was an executive assistant at a real estate company.  Id.  Prior to that, she was a legal assistant.  Id.

Vocational expert Esperanza DiStefano testified that she was familiar with jobs that exist in both the region and the national economy.  R. 105.  She defined the region as the "White Plains, New York metropolitan area," which includes Westchester County, the county where Evans lives.  R. 107.  The vocational expert classified Evans's past work as follows: contract negotiator, Dictionary of Occupational Titles ("DOT") code 162.117-018, which is a "light

7

exertion, skilled position with a specific vocational preparation ["SVP"] of 8"; executive

assistant, DOT code 186.167-066, which is a "light exertion, skilled position with a specific

vocational preparation of 8"; and legal assistant, DOT code 119.267-022, which is a "sedentary,

skilled position with an SVP of 7."[3]  R. 108.

      The ALJ asked the vocational expert whether there were jobs that could be performed by

a hypothetical individual of Evans's age, education, and work experience, who is able to do the

full range of sedentary work, except that she is limited to occasional climbing ramps or stairs; no

climbing ladders, ropes or scaffolds; occasional balancing, stooping kneeling, crouching, and

crawling; and up to frequent rotation, flexion, or extension of the neck; and who is unable to

perform her past work and is limited to low-stress jobs defined as involving only occasional

decision-making and interaction with coworkers, the general public, and supervisors.  R. 108-09.

The vocational expert testified that such an individual could perform the following jobs: order

clerk, DOT code 209.567-014, which is a "sedentary, unskilled position with an SVP of 2" and

has 208,800 positions nationally and 6,310 regionally; addresser, DOT code 209.587-010, which

is a "sedentary, unskilled position with an SVP of 2" and has 95,560 positions nationally and

5,360 regionally; document preparer, DOT code 249.587-018, which is a "sedentary, unskilled

position with an SVP of 2" and has 2,808,100 positions nationally and 134,100 regionally.  R.

---

[3]  The Dictionary of Occupational Titles (the "DOT") has been replaced by an online database called the Occupational Information Network or the O*NET.  See Dictionary of Occupational Titles Fourth Edition, Revised 1991, U.S. Dep't of Labor, http://www.oalj.dol.gov/libdot.htm.  The O*NET defines SVP as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  O*NET OnLine Help, https://www.onetonline.org/help/online/svp.  The SVP "levels" correspond to time periods. For example, Level 8 is a time period of 4 to 10 years whereas Level 2 is "[a]nything beyond short demonstration up to and including 1 month."  Id.

109.

The ALJ also asked the vocational expert about a second hypothetical individual that had the same limitations as the first hypothetical individual with the added limitation of needing to be "off task for 20 percent of the work period in addition to regularly scheduled breaks" — regularly scheduled breaks being defined as "15 minutes in the morning, 15 minutes in the afternoon and then a half hour to an hour for lunch." R. 109-110.  The vocational expert testified that this second hypothetical individual would be precluded from all full-time positions.  R. 110.

Evans's attorney asked the vocational expert about the allowable amount of absences per month in the industries mentioned in the response to the first hypothetical.  Id.  The vocational expert testified that an individual who needed to take off three days per month would be precluded from all work, while an individual who needed to take off two days per month would be "acceptable."  R. 110-11.

D.      The ALJ's Decision

On September 27, 2013, the ALJ issued a decision finding that Evans was not disabled. R. 14-26.  The ALJ found that Evans had not engaged in substantial gainful activity since September 30, 2011, the amended alleged onset date of her disability.  R. 19.  The ALJ found that Evans had the following "severe" impairments: "multi-level degenerative disc disease of the lumbar spine; herniated discs at C3-6 (status post laminoplasty of C3-C7); attention deficit hyperactivity disorder; and anxiety disorder/panic disorder without agoraphobia."  Id.  The ALJ also found that Evans's hypertension was not severe because it caused no functional limitations. Id.  The ALJ then determined that none of Evans's impairments or combination of impairments "meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 19-20.  Specifically, the ALJ determined that Evans's back

impairment does not rise to the level of meeting the spinal stenosis, nerve root, or spinal cord compression requirements of listing 1.04.  R. 20.  The ALJ found that Evans does not have evidence of nerve root compression characterized by a neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, and positive straight-leg raising tests; spinal arachnoiditis, manifested by severe burning or painful dysesthesia; lumbar spinal stenosis resulting in pseudoclaudication; or an inability to ambulate effectively, as defined in the regulations.  Id.  The ALJ also found that Evans does not have an inability to perform fine and gross movements effectively.  Id.  The ALJ noted that the medical records consistently revealed that Evans had a normal gait and full muscle strength.  Id.  The ALJ also determined that Evans's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of the relevant listing because the mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration.  R. 20-21.

Next, the ALJ found that Evans has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), "except limited to occasional climbing ramps and stairs, no climbing ladders, ropes or scaffolds; limited to occasional balancing, stooping, kneeling, crouching, crawling, with frequent rotation/flexion and extension of the neck in a low stress work environment," which was defined as involving only occasional decision-making and occasional interaction with the general public, co-workers, and supervisors.  R. 21.  On this point, the ALJ found that while the record documented multi-level degenerative disc of the lumbar spine and herniated discs at C3-6, as well as attention deficit hyperactivity disorder and anxiety disorder/panic disorder without agoraphobia, Evans's physical and mental examinations were consistently stable and her activities of daily living were

10

"clearly contrary to the allegations" regarding Evans's impairments.  R. 22.  The ALJ

determined that "the record and hearing testimony support the conclusion that [Evans] is capable

of performing a wide range of sedentary work."  R. 21.  The ALJ also summarized the medical

evidence of record on which he had relied in making his RFC determination, which included the

following: Evans's self-reported descriptions of her daily activities and her testimony at the

hearing; a consultative evaluation by Dr. William Lathan; records from an EMG examination,

medical records from Dr. Michael Neuwirth of the Beth Israel Medical Center; medical records

from the Mount Kisco Medical Group; an evaluation by Dr. Bella Malits, a pain management

specialist with the Mount Kisco Medical Group; records from licensed clinical social worker

Donna Pappalardo; records from family nurse practitioner Mary Morton of Middletown Medical

P.C.; and medical records from Elizabeth Kronk, Psy. D.  R. 21-23.

       The ALJ also discussed the opinion evidence.  He accorded "some weight" to the opinion

of Dr. Lathan, noting that Dr. Lathan's findings "are well supported by his own unremarkable

examination of" Evans.  R. 23-24.  The ALJ also accorded "[s]ome weight" to the opinion of

Ms. Morton, because her assessment "is well supported by the evidence of record."  R. 24.  The

ALJ accorded "[g]reat weight" to the opinion of Dr. Kronk, because her assessment "is well

supported by the mental health treatment reports" and "by her own stable mental health findings

of [Evans] except to the extent that could be interpreted that [Evans] needs supervision for

complex tasks."  Id.  The ALJ noted such a finding was inconsistent with Evans's "cum laude

status while independently taking B.S. classes."  Id.  The ALJ accorded "some weight" to "State

agency medical consultant Dr. Kleinerman," who "conducted his own analysis of the evidence

and concluded that [Evans] had no severe psychiatric impairment."  Id.  The ALJ accorded "little

weight" to the Department of Social Services opinion finding Evans was exempt from

11

participating in temporary assistance work activities, because it "was based on their own rules and is not binding on the Commissioner," and he found it to be inconsistent with Evans's activities of daily living and the medical records.  Id.  The ALJ also accorded "little weight" to the opinion of Ms. Pappalardo, finding that her assessments regarding Evans's social functioning and ability to respond to customary work pressures were inconsistent with her own treatment notes as well as treatment records throughout 2012.  R. 23.

The ALJ also described "several reasons" for his conclusion that Evans's allegations of debilitating symptoms "should be deemed to be not wholly credible": (1) Evans described daily activities that are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations; (2) the treatment Evans has received has been "essentially routine and/or conservative in nature"; and (3) Evans "betrayed no evidence of debilitating symptoms while testifying at the hearing," and, although not a conclusive indicator, this is given "some slight weight" in reaching the conclusion regarding Evans's credibility as to her allegations and her RFC.  R. 24.  The ALJ stated his RFC assessment "is supported by the clinical evidence, medical opinions of record, and [Evans's] own statements about her level of functioning."  Id.

Finally, the ALJ accepted the opinion of the vocational expert that Evans's past relevant work as a contract negotiator, executive assistance, and legal assistant exceeds her RFC, and therefore she is unable to perform her past relevant work.  R. 24-25.  The ALJ also accepted the opinion of the vocational expert that Evans could perform the jobs of order clerk, addresser, and document preparer.  R. 25-26.  Based upon the vocational expert's testimony, the ALJ concluded that "considering [Evans's] age, education, work experience, and residual functional capacity, [she] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  R. 26.  Therefore, the ALJ found Evans was "not disabled."

Id.

II.     APPLICABLE LAW

    A.      Scope of Judicial Review Under 42 U.S.C. § 405(g)

    A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) (2012) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

    "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted); see McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the "substantial evidence" standard as "a

very deferential standard of review — even more so than the 'clearly erroneous' standard."

Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation

omitted).  "The substantial evidence standard means once an ALJ finds facts, [a court] can reject

those facts only if a reasonable factfinder would have to conclude otherwise."  Id. at 448

(emphasis in original) (citation and internal quotation marks omitted).  "The role of the

reviewing court is therefore quite limited and substantial deference is to be afforded the

Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454 (citation and internal quotation

marks omitted).

      B.      Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A person

will be found to be disabled only if it is determined that his "impairment or impairments are of

such severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy."  Id. § 423(d)(2)(A).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that

the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. §§ 404.1,

404.1520(a)(4) (2014); see also Burgess, 537 F.3d at 120 (describing the five-step process).

First, the Commissioner must determine whether the claimant is currently engaged in any

"substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not

engaged in substantial gainful activity, the Commissioner must decide if the claimant has a

"severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which

is an impairment or combination of impairments that "significantly limits [the claimant's]

physical or mental ability to do basic work activities," id. § 404.1520(c).  Third, if the claimant's

impairment is severe and "meets or equals" one of the listings in 20 C.F.R. Part 404, Subpart P,

Appendix 1, and "meets the duration requirement," the claimant must be found disabled.  Id.

§ 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment does not meet or equal one of the

listed impairments, or does not meet the duration requirement, the Commissioner must review

the claimant's residual functional capacity to determine if the claimant is able to do the work he

or she has done in the past, i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is

able to do such work, he or she is not disabled.  Id.  Finally, if the claimant is unable to perform

past relevant work, the Commissioner must decide if the claimant's residual functional capacity,

in addition to his or her age, education, and work experience, permit the claimant to do other

work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be

deemed disabled.  Id.  The claimant bears the burden of proof on all of these steps except the

final one — that is, proving that there is other work the claimant can perform.  See Poupore v.

Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.     DISCUSSION

Evans, through her attorney, challenges the ALJ's ruling on the following grounds: (1) the ALJ's decision was not supported by substantial evidence; (2) the ALJ incorrectly disregarded the opinion of Evans's psychotherapist; (3) the ALJ failed to "fully inquire of the treating doctors" as to Evans's "importantly limited functions as the result of her impairments"; (4) the ALJ "did not provide rational bases for rejection of [Evans's] testimonial and other statements regarding medically determined impairments and their disabling effects"; and (5) the ALJ failed to adequately explain his RFC finding.  See Pl. Mem. at 5-11.  We note that in many instances Evans's challenges are generic — that is, she recites the applicable legal standards but does not explain how those standards should be applied in this case.  Nonetheless, we have attempted to address Evans's arguments as best as we can discern them.

A.     Substantial Evidence

The ALJ's decision makes a number of factual determinations.  We begin by considering whether there is substantial evidence in the record supporting the ALJ's findings that none of Evans's impairments, taken individually or in combination with each other, meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 19-20.  The ALJ determined Evans has the following "severe" impairments: "multi-level degenerative disc disease of the lumbar spine; herniated discs at C3-6 (status post laminoplasty of C3-C7; attention deficit hyperactivity disorder; anxiety disorder/panic disorder without agoraphobia."  R. 19.

First, the ALJ determined that Evans's spine impairment did not rise to the level of medical listing 1.04 because Evans does not have "evidence of nerve root compression characterized by a neuro-anatomic distribution of pain, limitation of motion of the spine, motor

16

loss . . . accompanied by sensory or reflex loss, and positive straight-leg raising tests . . . ; spinal arachnoiditis, manifested by severe burning or painful dysesthesia; lumbar spinal stenosis resulting in pseudoclaudication; or an inability to ambulate effectively, as defined in 1.00B2b." R. 20.  The ALJ also found that Evans does not have an "inability to perform fine and gross movements effectively, as defined in 1.00B2c."  Id.  The ALJ noted that the medical record consistently revealed that Evans had a normal gait and full muscle strength.  Id.

Listing 1.04 concerns "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root . . . or the spinal cord."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04.  Listing 1.04 requires "[e]vidence of nerve root compression . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test;" "[s]pinal arachnoiditis . . . manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or [l]umbar spinal stenosis . . . resulting in inability to ambulate effectively."  Id.  An "inability to ambulate effectively" has been defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities."[4]  Id. § 1.00(B)(2)(b)(1).

_____

[4]  The regulations further explain:

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living [and] . . . must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as

The objective medical evidence in the record supports the ALJ's finding that Evans's spine impairment does not rise to listing level. Evans herself testified that her lumbar issue had largely resolved and was no longer a problem. R. 91. In January 2012, Dr. Alexandra McBride, a neurologist at the Mount Kisco Medical Group, found that Evans had "[n]o clear nerve root impingement." R. 381. In February 2012, Dr. McBride found some stenosis in the cervical spine, but not in the lumbar spine. R. 374-75. In February 2012, Dr. Conrad Cean, a pain management specialist at the New York Pain Management Group, noted that Evans's musculoskeletal and neurological systems were "Normal." R. 447. The objective medical evidence also supports the ALJ's findings that Evans does not have "an inability to ambulate effectively," that she does not have "an inability to perform fine and gross movements effectively," and that she has "a normal gait and full muscle strength." R. 20. Evans testified that she did yoga and used an elliptical machine twice a week. R. 91. In January 2012, Dr. McBride found that Evans had a "stable narrow-based gait," R. 381, and noted that Evans was doing yoga, R. 380. Later in January 2012, Evans began weight lifting again. R. 578. In February 2012, Dr. McBride noted that Evans had been doing low-impact aerobic activity and limited weight lifting. See R. 374. Evans denied any joint pain, limitation of joint movement, or muscle pain or cramps in February, March, and May of 2012. R. 388, 396, 402. In June 2012, Evans saw Dr. Barry Krosser for an orthopedic spine evaluation, where he noted that Evans was "very active" and "works out extensively," although he also noted that Evans felt that she was

---

shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b)(2).

"walking unusual" because of "left leg symptoms."  R. 599.  The ALJ's conclusion that Evans's spinal impairment does not meet listing 1.04 was supported by substantial evidence.

Second, the ALJ determined that Evans's "mental impairments," considered singly and in combination, do not meet or medically equal the criteria of listing 12.06.  R. 20.  The ALJ found that Evans's impairments did not satisfy the "'paragraph B' criteria" because Evans did not have at least two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  Id.  The ALJ also found that the "evidence fail[ed] to establish the presence of the 'paragraph C' criteria."  R. 21.

Listing 12.06 concerns "[a]nxiety [r]elated [d]isorders," where "anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06.  A claimant will be found to have the listed impairment "when the requirements in both [paragraph] A and B are satisfied, or when the requirements in both [paragraph] A and C are satisfied."  Id. §12.06.  Paragraph B requires at least two of the following: "Marked restriction of activities of daily living;" "Marked difficulties in maintaining social functioning;" "Marked difficulties in maintaining concentration, persistence, or pace;" or "Repeated episodes of decompensation, each of extended duration."  Id. §12.06(B).  "Marked" is defined as "more than moderate but less than extreme" and may arise "when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."  Id. § 12.00(C).  Paragraph C requires that a claimant have a "complete inability to function independently outside the areas of one's home."  Id. § 12.06(C).

As to the paragraph B criteria, the ALJ found that in activities of daily living, Evans had

only "mild restriction," noting that she drives, recently received a degree in fashion merchandising and graduated cum laude, and was starting additional online classes.  R. 20.  With respect to her social functioning, he found that she had only "moderate difficulties," noting that she has "friends with whom she socializes and goes to the beach with."  Id.  With respect to her concentration, persistence, and pace, the ALJ found Evans had only "mild difficulties," noting that her ability to complete college and graduate cum laude supports a finding of "no more than moderate difficulties in this area."  Id.  As for episodes of decompensation, the ALJ found Evans "experienced no episodes of decompensation, which have been of extended duration" and "no evidence of decompensation."  Id.

There was substantial evidence to support the ALJ's assessments.  In September 2011, a family nurse practitioner, Ms. Morton, evaluated Evans's mental status and found that her "Judgment and Insight, Memory, Mood and affect and Depression/Anxiety" were "Normal."  R. 431.  In January 2012, Dr. McBride noted that Evans had "normal naming, repetition, fluent speech," "intact immediate, recent, and remote recall," and "[n]ormal concentration" and "fund of knowledge."  R. 381.  In July 2012, Dr. Kronk conducted a consultative psychiatric evaluation of Evans, and while she noted that Evans "reports having significant difficulties with planning and sequencing as well as short-term memory and concentration difficulties," R. 456, Dr. Kronk also opined that Evans was "able to follow and understand simple directions and instructions," "perform simple tasks independently," "maintain attention and concentration as well as maintain a regular schedule," "learn new tasks, as well as perform complex tasks with supervision," "make appropriate decisions, relate adequately with others, and appropriately deal with stress," R. 458.  Also, while Dr. Kronk noted that Evans's difficulties were "caused by anxiety" and "appear to be consistent with psychiatric problems," Dr. Kronk opined that they did "not appear

to be significant enough to interfere with [Evans's] ability to function on a daily basis." Id.

Additionally, Evans's self-reported activities also suggested at most moderate limitations in these categories. For example, on July 9, 2012, Evans reported to Dr. Kronk during the consultative psychiatric evaluation, R. 457, and Dr. William Lathan during a consultative physical examination, R. 462, that she is able to perform activities of personal care and daily living. On June 17, 2013, Evans reported that she was able to perform her activities of daily living without too much difficulty. R. 640. Evans also testified that she lives with a roommate, R. 80, and has friends who visit her at her house and go to the movies and the beach with her, R. 81-82. Evans had also just graduated cum laude with a degree in fashion merchandising, R. 82, and was able to study two hours a day for additional online classes, R. 96-98.

We also find substantial evidence to support the ALJ's finding that Evans's hypertension was not a "severe" impairment. R. 19. The ALJ specifically noted that Evans's hypertension was "well controlled with medication" and "causes no functional limitations." Id. Under the applicable regulations, an impairment is considered to be "non-severe" if it "does not significantly limit [the claimant's] physical or mental ability to do basic work activities."[5] 20 C.F.R. §§ 404.1521(a), 416.921(a). Following Evans's consultative examination, Dr. Lathan

---

[5] The regulations also define "basic work activities" as

the abilities and aptitudes necessary to do most jobs. Examples of these include — (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."

20 C.F.R. § 416.921(b).

noted Evans's "[h]istory of hypertension." R. 464. However, Dr. Lathan opined that Evans had "[n]o restriction." Id. Specifically, he noted that Evans "can perform all activities of personal care and daily living," and that her physical examination revealed that Evans was not in acute distress, her gait was normal, she was able to squat and needed no "assistive devices" or help changing or getting on and off the exam table, and she was able to rise from her chair "without difficulty." R. 462-63. Evans's blood pressure on June 1, 2012 was 144/86, which is indicative only of mild hypertension.[6] R. 593. Additionally, the objective medical evidence shows that her hypertension improved with medication: Evans's blood pressure was 132/78 on June 29, 2012, R. 601, 120/70 on July 9, 2012, R. 463, 110/80 on November 21, 2012, R. 616, and 130/80 on December 21, 2012, R. 620.[7] The record shows no reported side effects of the medication that would limit her ability to perform "basic work activities," and Evans was able to look for work and engage in regular exercise throughout the period of her alleged disability. See, e.g., R. 91, 374, 380, 391 (notes from Ms. Morton indicating that Evans was "out and . . . looking for employment" as of April 26, 2012); R. 578, 599. Accordingly, there is substantial evidence in the record supporting the ALJ's conclusion that Evans's hypertension is not a severe impairment. See Mejia v. Astrue, 719 F. Supp. 2d 328, 341 (S.D.N.Y. 2010) (hypertension was not a severe impairment where claimant "responded favorably to treatment and . . . could participate in a variety of non-strenuous activities") (citations omitted).

---

[6] Blood pressure that has either a systolic pressure (the first number) of 140-159 or a diastolic pressure (the second number) of 90-99 is categorized as Stage 1 Hypertension. U.S. Department of Health and Human Services, The Seventh Report of the Joint National Committee on Prevention, Detection, Evaluation, and Treatment of High Blood Pressure 12 (2004) ("JNC 7 Classification").

[7] Blood pressure that has either a systolic pressure of 120-139 or a diastolic pressure of 80-89 is categorized as Prehypertension. JNC 7 Classification.

We next consider whether there substantial evidence to support the ALJ's finding that Evans has the

> residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except limited to occasional climbing ramps and stairs, no climbing ladders, ropes or scaffolds; limited to occasional balancing, stooping, kneeling, crouching, crawling, with frequent rotation/flexion and extension of the neck in a low stress work environment (defined as having only occasional decision making and occasional interaction with the general public, co-workers and supervisors[)].

R. 21.  Under the governing regulations, "sedentary work"

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a); accord Halloran v. Barnhart, 362 F.3d 28, 31 n.3 (2d Cir. 2004).

The ALJ highlighted extensively the objective medical evidence in the record supporting his conclusion that Evans is "capable of performing a wide range of sedentary work."  R. 21. For example, although Evans alleged disability based on back pain, she testified at her hearing that her lower back does not hurt often and it had "never been a problem."  R. 91.  The ALJ noted that Evans had surgery on her cervical spine in August 2012, but that treatment notes prior to the surgery indicated that Evans had only "minimal tenderness along the paravertebral lumbosacral area with a negative SLR and negative CLR."  R. 22, 397.  These treatment notes also showed "[n]o sensory deficits in the upper and lower extremities" and "excellent peripheral pulses and 2+ reflexes in the upper and lower extremities."  R. 397.  The July 9, 2012 consultative examination by Dr. Lathan showed that Evans had full range of motion in her

cervical and lumbar spine.  R. 464.  Dr. Lathan opined that Evans has "[n]o restriction."  Id.  An

EMG on July 12, 2012, showed "no evidence of left-sided cervical or lumbar radiculopathy" and

"no evidence of other peripheral neuropathic process affecting left upper and lower extremities."

R. 602.  The ALJ noted that following the surgery, follow-up visits showed Evans was doing

well.  R. 22.  In August 2012, Evans was noted to be "doing well postoperatively" and she was

"off of her pain medications."  R. 513.  In October 2012, Dr. Neuwirth noted Evans was "doing

quite well," although she had "a little soreness in her neck, a little pain and achiness."  R. 514.

Dr. Neuwirth advised Evans to increase her activities.  Id.  Dr. Neuwirth also reported that the

"numbness and tingling type symptoms" Evans had in her left arm and left leg had essentially

resolved and that her x-rays were unremarkable.  Id.  On November 29, 2012, Dr. Neuwirth

noted that Evans's physical examination was "benign" and that Evans was "physically doing a

lot of stuff" such as physical therapy, additional exercises on her own, and "kind of a normal

lifting and carrying that she does throughout her general lift [sic]."  R. 515.  Indeed, Dr.

Neuwirth opined that Evans was "probably . . . doing a little too much."  Id.

The ALJ noted that a December 21, 2012 visit to the Mount Kisco Medical Group

revealed normal musculoskeletal and neurological findings.  R. 23, 619.  On March 21, 2013, Dr.

Malits, noted that Evans did not require walking aids, had 5/5 strength in her upper and lower

extremities bilaterally, and had no sensory deficits, although Dr. Malits did note that Evans had

limited range of motion in her cervical spine.  R. 625.  On June 17, 2013, Evans reported that

although she was in pain, she was "able to get through" her activities of daily living "without too

much difficulty," but when she performed her "normal every day activities, which include

working out at the gym," her pain increased.  R. 640.

As for Evans's mental impairments, the ALJ noted that the record documents mental

health treatment for anxiety.  R. 23.  The consultative psychiatric evaluation on July 9, 2012 by

Dr. Kronk acknowledged some anxiety and attention deficit disorder, but Dr. Kronk opined that

Evans's psychiatric problems were not "significant enough to interfere with [her] ability to

function on a daily basis."  R. 458.  Dr. Kronk noted that Evans's attention and concentration

were intact, that she was able to dress, bathe, and groom herself as well as cook and prepare

food, that she was able to do the cleaning and laundry with some assistance, and that she was

able to do the shopping, money managing, and driving as well as take public transportation.  R.

457.  Evans reported to Dr. Kronk that she socialized with friends, had good family

relationships, and went to the beach and museums, as well as the ballet, though it was becoming

more difficult due to her fear of falling down.  Id.  Dr. Kronk opined that Evans is able to follow

and understand simple directions and instructions; perform simple tasks independently; maintain

attention and concentration, as well as maintain a regular schedule; learn new tasks and perform

complex tasks with supervision; make appropriate decisions; relate adequately with others; and

appropriately deal with stress.  R. 458.  Dr. Kronk assessed no restrictions that would preclude

Evans from performing sedentary work.  The ALJ also noted that Evans's anxiety had been well

controlled with Xanax.  R. 23.

In light of these medical findings, there is substantial evidence in the record to support

the ALJ's conclusion that Evans retains the RFC to do sedentary work with certain limitations

described by the ALJ.  This conclusion is further supported by Evans's own admitted activities

of daily life during the hearing.  Evans is able to do yoga and exercise weekly, R. 90-91, and

takes care of her dog, R. 82-83, goes food shopping, R. 81, cooks using the microwave, id., has

friends who go to her house and with whom she has been able to go to the movies and the beach,

R. 81-82, goes to museums, R. 81, and drives, R. 87.  Evans was able to take classes online full-

time, graduated <u>cum laude</u> with a degree in fashion merchandising, R. 82, and was able to spend

two hours a day studying for additional online classes, R. 96-98.  All of these support the

conclusion that Evans is able to meet the exertional demands of sedentary work.

      The ALJ also properly determined that "[c]onsidering [Evans's] age, education, work

experience, and residual functional capacity, there are jobs that exist in significant numbers in

the national economy that [Evans] can perform."  R. 25.  The vocational expert testified that

various unskilled sedentary jobs exist that a person with Evans's limitations would be capable of

performing.  R. 108-109.  The vocational expert used the DOT to opine that Evans could work as

an order clerk, an addresser, or a document preparer, all of which are jobs that exist in significant

numbers in the national economy.  R. 109.  The ALJ properly relied on the vocational expert's

testimony regarding this issue.  <u>See</u> <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1553-54 (2d Cir. 1983)

(vocational expert's testimony on the availability of such sedentary jobs provided substantial

evidence for the ALJ's finding on this issue); <u>accord</u> <u>Santos v. Comm'r of Soc. Sec.</u>, 2013 WL

5883345, at *7 (S.D.N.Y. Oct. 28, 2013).  In sum, there is substantial evidence to support the

ALJ's finding that there existed substantial gainful employment that Evans would be capable of

performing.

      Evans argues that "[t]he evidence did not in fact show any visit to a museum post-

surgery; visits to a beach more than three times during the relevant period; more than

unexceptional basic shopping; or even frequent and congenial, social interaction."  Pl. Mem. at

7.  But the context of the questioning suggested that Evans testified that her movie, beach, and

social visits were ongoing.  R. 81-82.  Further, Evans's post-surgical records do not reflect any

worsening of her condition such that she would be unable to continue these activities.  <u>See</u>, <u>e.g.</u>,

R. 513-15, 625, 640.  Evans also contends that the ALJ "did not conscientiously elicit testimony

fro[m] [Evans] spelling out in detail" the nature and extent of her physical activities.  Pl. Reply at 2.  However, the ALJ's determination that her physical activities were inconsistent with her allegations is supported by substantial evidence in the record.  See, e.g., R. 91 (noting that Evans was doing yoga and used the elliptical machine a couple times per week and that her lumbar pain has "never been a problem"); R. 374 (noting that Evans was doing pilates, yoga, low-impact aerobic activity, and limited weightlifting); R. 380 (noting that Evans was doing yoga).

Evans also asserts that the fact that she "achieved cum laude status through internet study could not rationally [be] found to show an ability to perform substantial gainful activity, in light of [her] inability to attend classes away from her bed."  Pl. Reply at 3.  Evans asserts that "certain types of evidence are not dispositive — or even probative — of mental disability," such as evidence of intelligence or that she graduated cum laude. Id.  Evans's argument, however, misses the mark.  Here, the ALJ did not base his determination on Evans's degree of "intelligence."  Rather, he based his decision in part on Evans's ability to pursue academic goals coupled with her degree of success therein.  R. 20, 22-24.  While it is true that "highly intelligent and able people do fall prey to crippling" mental impairments, MacGregor v. Bowen, 786 F.2d 1050,1053-54 (11th Cir. 1986), and that a claimant's intelligence may not be dispositive, see York v. Bowen, 702 F. Supp. 903, 907-08 (N.D. Ga. 1987) (citation omitted), the ALJ could properly use her academic pursuit as a factor the ALJ may consider in making his determination as to her mental abilities, see, e.g., Tennant v. Apfel, 224 F.3d 869, 871 (8th Cir. 2000) (plaintiff's part-time college attendance, number of credits taken, and grade point average "appear[ed] inconsistent" with the alleged disability); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (plaintiff's "academic accomplishments and the daily activities that led to their achievement" contradicted the plaintiff's alleged disabling difficulties); Walters v. Astrue, 2013

WL 1755727, at *8 (W.D.N.Y. Apr. 24, 2013) (ALJ properly considered that the plaintiff's "mental impairments did not prevent him from successfully going to school and obtaining an associate's degree").

      B.     <u>Treating Source Opinion</u>

      Evans contends that the ALJ's disregard of the opinion of Evans's "long[-time] treating psychotherapist," licensed clinical social worker Donna Pappalardo, has "not been shown [to be] legally justified" and that the therapist's assessments reflect "listing level impairments over time."  Pl. Mem. at 7.

      As an initial matter, Ms. Pappalardo is not a "treating source," whose opinions, by regulations, are entitled to "more weight" when determining if a claimant is disabled.  <u>See</u> 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  A "[t]reating source means [a claimant's] physician, psychologist, or other acceptable medical source."[8]  <u>Id.</u> §§ 404.1502, 416.902.  A therapist is listed in the regulations among the "[o]ther sources" that may be used as evidence "to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work."  <u>Id.</u> §§ 404.1513(d)(1), 416.913(d)(1).  These "other sources" are not entitled to the level of deference accorded to treating sources, although they are still entitled to some weight, especially where there is a regular treatment relationship with the claimant.  <u>Pogozelski v. Barnhart</u>, 2004 WL 1146059, at *12 (E.D.N.Y. May 19, 2004) (citing cases).

      We find that there is substantial evidence to support the ALJ's decision to accord "little weight" to the opinion of Ms. Pappalardo.  R. 23.  While Ms. Pappalardo found marked

---

     [8]  Acceptable medical sources can include: "(1) Licensed physicians"; "(2) Licensed or certified psychologists"; "(3) Licensed optometrists"; "(4) Licensed podiatrists"; and "(5) Qualified speech-language pathologists."  20 C.F.R. §§ 404.1513(a), 416.913(a).

limitations in social functioning and severe limitations in Evans's ability to respond to customary work pressures, R. 516-19, the ALJ could properly find that these conclusions were "not supported and inconsistent with [Evans's] conservative treatment history, wide array of activities of daily living, and contemporaneous treatment notes," R. 23.  In this regard, the ALJ noted that Evans obtained a <u>cum</u> <u>laude</u> degree in fashion merchandising, was working towards her bachelor's degree, and that she "gets along with friends, and is able to go to the museum, shopping and beach."  <u>Id.</u>  He also noted that her "treatment records throughout 2012 consistently show stable mental examination findings and that [Evans's] anxiety is controlled with Xanax."  <u>Id.</u>  Further, Ms. Pappalardo's treatment notes "consistently indicated stable [GAF] abilities (ranging between 50 and 55)," which the ALJ found was "contrary to her marked and extreme limitations."[9]  <u>Id.</u>

The objective medical evidence in the record supports the ALJ's findings.  Medical records show stable mental examinations and effective treatment with medication.  In December 2011, Ms. Morton indicated that Evans's anxiety, although worsening since a motor vehicle accident in September 2011, had been well-controlled with medication.  R. 358.  In February 2012, Ms. Morton indicated Evans had "severe anxiety," R. 401, but subsequent records show that Evans's anxiety was still well-controlled with medication, <u>see</u>, <u>e.g.</u>, 388, 391-92, 395. Treatment notes from Ms. Pappalardo dated July 5, 2012 indicate Evans was "fine" taking her medications.  R. 524.  As the ALJ noted, <u>see</u> R. 23, Ms. Pappalardo also assessed Evans with GAF scores of 55 on February 25, 2013, R. 522, 50 on May 28, 2013, R. 520, and 55 on July 2,

---

[9]  The GAF scale was last used in the fourth edition of the DSM and reports an individual's "psychological, social, and occupational functioning" and was viewed as "particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."  <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32 (4th ed., text rev. 2000).

2013, R. 516.  While a GAF score of 50 indicates "[s]erious symptoms," a GAF score of 51-60

indicates only "[m]oderate symptoms."  Diagnostic and Statistical Manual of Mental Disorders

34 (4th ed., text rev. 2000).  On May 19, 2013, Evans was treated by Dr. Francis Hayden, a

psychiatrist, who assessed Evans with a GAF score of 50 and a total score of 13 on the PHQ-9,

indicating "Moderate Depression."[10]  R. 550-51.  Dr. Hayden noted Evans had intact attention,

normal awareness of surroundings, grossly intact cognitive abilities, coherent thought processes,

fair impulse control, and no formal thought or perceptual disorders.  R. 551.  On June 15, 2013,

Dr. Hayden assessed Evans as "stable," and compliant with her medications with no side effects.

R. 548.  Further, at her hearing, Evans testified that minor changes in her life, such as going food

shopping or having friends over, do not affect her anxiety in any significant way.  R. 93.

Evans argues that the ALJ's reliance on reported GAF scores was "in error," noting,

correctly, that the "GAF instrumentality has been eliminated from the current DSM."  Pl. Reply

at 2; see Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).  But given that

the GAF scale was in use at the time the scores were assessed, we do not see any error in the

ALJ's reliance on them.  Moreover, the ALJ's decision to accord "little weight" to Ms.

Pappalardo's opinion was not based solely on her somewhat inconsistent GAF assessments but

rather on consideration of other objective medical evidence in the record as described above.

C.      Development of the Record

Evans argues that the ALJ "had an obligation to energetically seek out from . . . treating

physicians, their considered opinions regarding onset, and functional ability since onset."  Pl.

_____

[10]  "PHQ–9 stands for 'Patient Health Questionnaire' and is used to assess and monitor
the severity of a patient's depression and/or anxiety."  Rodriguez v. Astrue, 2013 WL 1225394,
at *7 n.7 (E.D.N.Y. Mar. 27, 2013).  It is self-administered.  Briscoe v. Astrue, 892 F. Supp. 2d
567, 570 n.1 (S.D.N.Y. 2012).

Mem. at 7.  She asserts that since the ALJ "had concerns regarding treating opinions of marked functional effects caused by very severe and persistent impairments over time, he had a special obligation to re-contact for clarification" Evans's psychotherapist, Ms. Pappalardo.  Id.

The ALJ has an affirmative duty to develop the record in a disability benefits case. Shaw, 221 F.3d at 131.  Where the ALJ fails to develop the record, remand is appropriate.  Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999).  The ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits."  Sims v. Apfel, 530 U.S. 103, 111 (2000) (citation omitted).  Furthermore, the governing statute provides that the ALJ "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" the disability determination.  42 U.S.C. § 423(d)(5)(B); accord 20 C.F.R. §§ 404.1512(d), 416.912(d).  The ALJ's duty to develop the record remains the same regardless of whether the claimant is represented by counsel.  Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)).

On the other hand, it is well established that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  Rosa, 168 F.3d at 79 n.5 (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996) (where the ALJ had "already . . . obtained and considered reports" from treating physicians, the ALJ "had before him a complete medical history, and the evidence received from the treating physicians was adequate for him to make a determination as to disability")).  While there is case law suggesting that an ALJ has a duty to develop the record where there are "inconsistencies" in a treating physician's records, see Rosa, 168 F.3d at 79 (quoting Hartnett v. Apfel, 21 F. Supp.

2d 217, 221 (E.D.N.Y. 1998)); Calzada v. Astrue, 753 F. Supp. 2d 250, 278 (S.D.N.Y. 2010), we

believe such cases should be read as requiring further development of the record "only where the

record was incomplete," Brown v. Comm'r of Soc. Sec., 2014 WL 783565, at *17 (S.D.N.Y.

Feb. 28, 2014); accord Vanterpool v. Colvin, 2014 WL 1979925, at *16-17 (S.D.N.Y. May 15,

2014) (finding that ALJ did not have a responsibility to further develop the record where there

were discrepancies between the reports and contemporaneous records of the plaintiff's treating

physician).

Here, there is no indication that the ALJ's decision to afford "little weight" to the opinion

of Ms. Pappalardo resulted from incomplete treating records.  The ALJ did not reject Ms.

Pappalardo's opinion because of an incomplete record, but rather, as described above, because it

was inconsistent with other evidence in the record.  In these circumstances, Evans's argument

boils down to the proposition that an ALJ must contact a treating source before choosing to

reject that source's assessment of a claimant's functional capacity.  We find no warrant for such

a rule in the governing regulations or case law, however.

D.    Evans's Credibility

"It is the function of the [Commissioner], not [the reviewing court], to resolve

evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."

Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted).

Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other

indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the

degree of impairment."  Tejada, 167 F.3d at 776 (construing and citing with approval Pascariello

v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)).  Nonetheless, when discounting

credibility regarding the claimant's RFC, regulations impose some burden on the ALJ to explain

his or her decision.  As the Second Circuit has stated:

> When determining a claimant's [residual functional capacity], the ALJ is required
> to take the claimant's reports of . . . limitations into account, 20 C.F.R. § 416.929;
> see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d
> Cir. 1980), but is not required to accept the claimant's subjective complaints
> without question; he may exercise discretion in weighing the credibility of the
> claimant's testimony in light of the other evidence in the record.  Marcus v.
> Califano, 615 F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49.  To evaluate a claimant's assertion of a limitation, the ALJ must engage

in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a medically
> determinable impairment that could reasonably be expected to produce the symptoms
> alleged.  20 C.F.R. § 404.1529(b). . . .  If the claimant does suffer from such an
> impairment, at the second step, the ALJ must consider "the extent to which [the
> claimant's] symptoms can reasonably be accepted as consistent with the objective
> medical evidence and other evidence" of record.  Id.  The ALJ must consider
> "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions,
> [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s]
> to medical sources during the course of examination or treatment, or to [the agency]
> during interviews, on applications, in letters, and in testimony in [its] administrative
> proceedings."  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R.
> 96–7p.

Id. (alterations in original).

The Social Security Administration ("SSA") has issued a regulation relating to reports of

pain or other symptoms affecting the ability to work by a claimant for disability benefits.  20

C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  This regulation provides, inter alia, that the SSA "will

not reject [a claimant's] statements about the intensity and persistence of [her] pain or other

symptoms or about the effect [her] symptoms have on [her] ability to work . . . solely because

the available objective medical evidence does not substantiate [her] statements."  Id.

§§ 404.1529(c)(2), 416.929(c)(2).  The regulation also provides that the SSA "will consider

whether there are any inconsistencies in the evidence and the extent to which there are any

conflicts between [her] statements and the rest of the evidence." Id. §§ 404.1529(c)(4),

416.929(c)(4).

Where an ALJ rejects witness testimony as not credible, the basis for the finding

"must . . . be set forth with sufficient specificity to permit intelligible plenary review of the

record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing

Carroll, 705 F.2d at 643); accord Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999). The ALJ

must make this determination "in light of medical findings and other evidence[] regarding the

true extent of the pain alleged by the claimant." Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir.

1984) (citation and internal quotation marks omitted). However, where an ALJ gives specific

reasons for finding the claimant not credible, the ALJ's credibility determination "is generally

entitled to deference on appeal." Selian, 708 F.3d at 420 (citation omitted). Thus, "[i]f the

[Commissioner's] findings are supported by substantial evidence, the court must uphold the

ALJ's decision to discount a claimant's subjective complaints." Aponte v. Sec'y, Dep't of

Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted); see also

42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive . . . .").

As to the first step, the ALJ determined that Evans suffers from medically determinable

impairments that could reasonably be expected to cause her alleged symptoms. R. 23. However,

at the second step, the ALJ found that Evans's "statements concerning the intensity, persistence

and limiting effects of these symptoms [were] not entirely credibly for the reasons explained in

th[e] decision." Id. The ALJ's decision contained an extensive review of the record evidence,

R. 21-24, and discussed in detail important pieces of that evidence in finding Evans not credible,

R. 24.

34

Specifically, the ALJ found that Evans's "complaints of disabling symptoms and limitations" were inconsistent with her described daily activities, "which [were] not limited to the extent one would expect." Id. The ALJ noted that Evans has friends who come over to her house and with whom she goes to the movies and the beach; that she graduated from school online and studies for two hours a day for additional college classes; and that she is also able to take care of her dog and drive. R. 22. The record also shows that Evans was capable of working out, going to museums, shopping, taking care of her self, and performing household chores. See, e.g., R. 81, 87, 91, 96-98, 374, 380, 457, 462, 578, 599. As the ALJ noted, Evans reported to Middletown Medical P.C. that she was looking for work while going to school full-time in April 2012, R. 22, 391, although Evans denied looking for work when she testified, R. 88. The ALJ also noted that Evans was receiving "essentially routine and/or conservative" treatment for her allegedly disabling impairments. R. 24. Finally, the ALJ noted that Evans showed "no evidence of debilitating symptoms while testifying at the hearing." Id. Although the hearing was not a "conclusive indicator" of Evans's overall level of day-to-day functioning, the ALJ still gave it "some slight weight" in reaching his conclusion as to Evans's credibility. Id.

Evans argues that her credibility is supported by her extensive work history and "evident motivation to work again." Pl. Mem. at 10. Although it is true that a "long and honorable" work history supports a claimant's credibility, see Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983), the Court is aware of no case suggesting that such work history is conclusive as to credibility. Even a claimant with such a work history may be untruthful, and the ALJ is still entitled to make credibility determinations based on other evidence in the record, such as medical evidence. Punch v. Barnhart, 2002 WL 1033543, at *16 (S.D.N.Y. May 21, 2002).

Evans cites several cases in support of the contention that a claimant's performance of

minor everyday activities should not be a basis upon which to reject a claimant's statements. See Pl. Mem. at 9.  However, the ALJ made clear that his decision to reject Evans's statements was not based solely on her reported activities, but rather that he considered a number of factors — including both Evans's testimony and the medical evidence on the record — in deciding how much he would credit Evans's testimony.  R. 24.  We find that the ALJ adequately considered the extent to which Evans's statements about her symptoms were consistent with other record evidence and adequately explained his decision to not to credit Evans's statements to the extent of establishing a disability.

Because the ALJ's credibility determination with regard to Evans was not "clearly erroneous," this Court must accept his findings.  Aponte, 728 F.2d at 591 (where an ALJ's findings are supported by substantial evidence, a court "must uphold the ALJ's decision to discount a claimant's subjective complaints of pain") (citation omitted).

E.     Adequacy of ALJ's Explanation

Evans argues that the ALJ failed to adequately explain his RFC finding because he failed to provide a "detailed rationale spelling out the reasons for the weight assigned to each report, and opinion relied upon" in a "function-by-function" assessment as to how the probative evidence showed that Evans "remained capable of performing the [sic] all of the demands of particular jobs and ranges of work."  Pl. Mem. at 6 (citing 20 C.F.R. § 404.1527(d); SSR 96–8p). Evans does not specify in what ways the ALJ's decision was deficient.  Here, the ALJ carefully reviewed, considered, and explained all of Evans's physical and mental limitations, and reviewed all of the pertinent medical evidence, including explanations as to the weight assigned to each report and opinion relied upon.  R. 20-24.  The Second Circuit has held that "[w]here an ALJ's analysis . . . regarding a claimant's functional limitations and restrictions affords an

36

adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, . . . remand is not necessary merely because an explicit function-by-function analysis was not performed." <u>Cichocki v. Astrue</u>, 729 F.3d 172, 177 (2d Cir. 2014) (citations omitted). Here, all these criteria were met, and thus it would not be appropriate to remand this case to require a "function-by-function" analysis.

IV.     <u>CONCLUSION</u>

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 12) is granted, and Evans's motion for judgment on the pleadings (Docket # 9) is denied. The Clerk is requested to enter judgment and to close this case.

SO ORDERED

Dated: June 24, 2015
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge